**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————

**No. 13-8021**

———————

ALFREDO PRIETO,

Plaintiff - Appellee,

v.

HAROLD CLARKE, Director; A. DAVID ROBINSON, Deputy Director;
E. PEARSON, Warden,

Defendants - Appellants.

--------------------------

TONI V. BAIR; F. WARREN BENTON; KATHLEEN M. DENNEHY; BRIAN
JASON FISCHER; MARTIN F. HORN; STEVE J. MARTIN; CHASE
RIVELAND; REGINALD A. WILKINSON; JEANNE WOODFORD,

Amici Supporting Appellee.

———————

**No. 14-6226**

———————

ALFREDO PRIETO,

Plaintiff - Appellee,

v.

HAROLD CLARKE, Director; A. DAVID ROBINSON, Deputy Director;
E. PEARSON, Warden,

Defendants - Appellants.

--------------------------

TONI V. BAIR; F. WARREN BENTON; KATHLEEN M. DENNEHY; BRIAN JASON FISCHER; MARTIN F. HORN; STEVE J. MARTIN; CHASE RIVELAND; REGINALD A. WILKINSON; JEANNE WOODFORD,

Amici Supporting Appellee.

———————————

Appeals from the United States District Court for the Eastern District of Virginia, at Alexandria. Leonie M. Brinkema, District Judge. (1:12-cv-01199-LMB-IDD)

———————————

Argued: October 28, 2014                    Decided: March 10, 2015

———————————

Before MOTZ, SHEDD, and WYNN, Circuit Judges.

———————————

Reversed by published opinion. Judge Motz wrote the majority opinion, in which Judge Shedd joined. Judge Wynn wrote a dissenting opinion.

———————————

**ARGUED**: Stuart Alan Raphael, OFFICE OF THE ATTORNEY GENERAL OF VIRGINIA, Richmond, Virginia, for Appellants. Michael E. Bern, LATHAM & WATKINS LLP, Washington, D.C., for Appellee. **ON BRIEF**: Mark R. Herring, Attorney General of Virginia, Cynthia E. Hudson, Chief Deputy Attorney General, Linda L. Bryant, Deputy Attorney General, Public Safety & Enforcement, Richard C. Vorhis, Senior Assistant Attorney General, Kate E. Dwyre, Assistant Attorney General, Trevor S. Cox, Deputy Solicitor General, OFFICE OF THE ATTORNEY GENERAL OF VIRGINIA, Richmond, Virginia, for Appellants. Abid R. Qureshi, Katherine M. Gigliotti, Daniel I. Levy, LATHAM & WATKINS LLP, Washington, D.C., for Appellee. Rebecca K. Glenberg, Hope R. Amezquita, AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF VIRGINIA, Richmond, Virginia; Amy Fettig, Helen Vera, AMERICAN CIVIL LIBERTIES UNION NATIONAL PRISON PROJECT, Washington, D.C., for Amici Curiae.

———————————

DIANA GRIBBON MOTZ, Circuit Judge:

The district court held that the procedural Due Process rights of a capital prisoner were violated by a state policy requiring his confinement, prior to execution, in a single cell with minimal visitation and recreation opportunities. The court ordered state officials either to alter the policy or to improve these conditions. The officials appeal and, for the reasons that follow, we reverse.

I.

Upon conviction for two capital murders and receipt of two death sentences, Alfredo Prieto was incarcerated by the Commonwealth of Virginia at Sussex I State Prison in Waverly, Virginia. Prieto is one of eight Virginia convicts imprisoned after receipt of the death penalty. All eight capital offenders are housed in the same portion of Sussex I, known widely as Virginia's "death row." Appellant's Br. 11-13.

A written state policy mandates that all persons sentenced to death in Virginia be confined on death row while awaiting execution. See Virginia Dep't. of Corr. Operating Procedure 830.2(D)(7), 460.1A (I). Unlike other prisoners, these prisoners are not subject to security classification or assignment to any alternative confinement. Id. Inmates on death row live in separate single cells, with visitation and

3

recreation restrictions more onerous than those imposed on other inmates.

After incarceration on Virginia's death row for nearly six years as he pursued post-conviction challenges, Prieto brought this 42 U.S.C. § 1983 action pro se. He alleged that his confinement on death row violated his procedural Due Process and Eighth Amendment rights and sought injunctive relief. The district court dismissed the Eighth Amendment claim but found that Prieto had stated a plausible Due Process claim and appointed counsel for him.[1] Following discovery, the parties filed cross motions for summary judgment.

The district court granted Prieto's motion. The court noted that the conditions on Virginia's death row were "eerily reminiscent" of those held in Wilkinson v. Austin, 545 U.S. 209 (2005), to implicate a liberty interest protected by the Due Process Clause. See Prieto v. Clarke, No. 12-1199, 2013 WL 6019215, at *6 (E.D. Va. Nov. 12, 2013). Reasoning that because these conditions were "uniquely severe" and pervasive compared to the conditions of the general prison population, the court concluded that Prieto had established a Due Process liberty interest in avoiding them and that Prieto's automatic and

---

[1] Prieto initially appealed the district court's dismissal of his Eighth Amendment claim, but we dismissed the appeal for failure to prosecute and Prieto does not challenge that decision in the present appeal.

4

permanent assignment to death row did not afford him constitutionally adequate process. Id. at *7-8.

The district court then issued an injunction ordering Virginia prison officials either to "improve [Prieto]'s conditions of confinement" or provide Prieto with "an individualized classification determination" for his prison housing, like the classification procedure afforded by state law to non-capital offenders. Id. In a subsequent order, the court awarded Prieto all costs and attorney's fees. The prison officials appeal both orders; we consolidated the cases on appeal.

II.

The Due Process Clause of the Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV. To state a procedural due process violation, a plaintiff must (1) identify a protected liberty or property interest and (2) demonstrate deprivation of that interest without due process of law. Because we conclude that Prieto cannot establish a protected liberty interest, we need not consider the sufficiency-of-process requirement.

The Supreme Court has long recognized that a prisoner may have a state-created liberty interest in certain prison

5

confinement conditions, entitling him to procedural Due Process protections.  See, e.g., Meachum v. Fano, 427 U.S. 215 (1976); Wolff v. McDonnell, 418 U.S. 539 (1974).[2]  But the Court has been equally clear that if no state statute, regulation, or policy creates such a liberty interest, a prisoner cannot "invoke the procedural protections of the Due Process Clause."  Meachum, 427 U.S. at 224.  And the Court has expressly "reject[ed] . . . the notion that any grievous loss visited upon a person by the State is sufficient" to require constitutionally adequate procedure. Id.

In the late 70s and early 80s the Court broadly defined state-created interests, holding that any mandatory state directive created a state law liberty interest triggering procedural Due Process protections.  See, e.g., Hewitt v. Helms, 459 U.S. 460 (1983); Greenholtz v. Inmates of Neb. Penal and Corr. Complex, 442 U.S. 1 (1979).  In an effort to eliminate the

---

[2] The Court has also held that such a liberty interest can arise from the Constitution itself but only rarely has recognized such an interest.  See, e.g., Vitek v. Jones, 445 U.S. 480, 493-494 (1980) (recognizing liberty interest in avoiding involuntary psychiatric treatment and transfer to mental institution).  For the first time on appeal, Prieto contends that the Constitution standing alone provides a liberty interest entitling him to relief.  Even if he had preserved this argument, it would be meritless.  See Sandin v. Conner, 515 U.S. 472, 480 (1995) ("The Due Process Clause standing alone confers no liberty interest in freedom from state action taken within the sentence imposed."  (internal quotations and citation omitted)).

resultant "[p]arsing" of state statutes to find rights by "negative implication," the Court corrected course in <u>Sandin v. Conner</u>, 515 U.S. 472, 481-82 (1995). There it added a second requirement for establishing a liberty interest warranting constitutionally adequate process. <u>Sandin</u> holds that, while a state statute or policy may "create liberty interests" giving rise to Due Process protection, this is so only if the denial of such an interest "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." <u>Id.</u> at 484.

A decade later, in <u>Wilkinson v. Austin</u>, 545 U.S. 209 (2005), the Court applied this "two-part analysis."[3] <u>Wilkinson</u> expressly reaffirmed that in determining if a prisoner has established a state-created liberty interest in certain conditions of confinement, the "threshold question" is whether such an interest "arise[s] from state policies or regulations." <u>Id.</u> at 221-22. The Court then reiterated that even if state policies could be read to create such an interest, to garner the protection of the Due Process Clause an inmate must also

_____

[3] The Second Circuit has so dubbed and then applied this analysis first established in <u>Sandin</u>. <u>See</u> <u>Tellier v. Fields</u>, 280 F.3d 69, 80 (2d Cir. 2000). <u>Contra</u> <u>Chappell v. Mandeville</u>, 706 F.3d 1052, 1064 (9th Cir. 2013) (bypassing the first prong in this two-part analysis); <u>but see</u> <u>id.</u> at 1065-66 (Graham, J., concurring in the judgment) (labeling majority's departure from this "two-part inquiry" a "radical change in due process jurisprudence").

7

establish that "the nature of [the] conditions themselves, 'in relation to the ordinary incidents of prison life,'" impose "an atypical and significant hardship." Id. at 223 (quoting Sandin, 515 U.S. at 484).

When the Wilkinson Court applied this two-prong analysis, the parties agreed as to the first prong. That is, the State and the inmates agreed on the "threshold question," that written Ohio prison classification regulations controlled the prison assignment, and so confinement conditions, of all inmates. Id. at 215-17, 221. The Wilkinson Court thus focused on the second prong: whether these regulations created a "liberty interest in avoiding restrictive conditions of confinement." Id. at 223. Reiterating Sandin's teaching, Wilkinson noted that the "touchstone of th[is] inquiry . . . is not the language of the regulations regarding those conditions," but whether their application imposed "atypical and significant hardship . . . in relation to the ordinary incidents of prison life." Id. (quoting Sandin, 515 U.S. at 484) (internal quotation marks omitted). Assignment to and confinement at the supermax was found to constitute an "atypical and significant hardship," because all other prisons in which the inmates could have been housed under Ohio's classification regulations had markedly less-onerous confinement conditions. See id. at 223-24. And, for this reason, the Court concluded that "under any plausible

8

baseline," the harsh conditions at the supermax "g[a]ve rise to a liberty interest in their avoidance." Id. at 223-24.[4]

Prieto properly recognizes the importance of Sandin and Wilkinson to his challenge. But his analysis, which the district court adopted, rests on interrelated, critical misunderstandings of those cases. Prieto treats Sandin and Wilkinson as establishing a new regime in which atypical and harsh confinement conditions, in and of themselves, give rise to a protected liberty interest, regardless of whether any state law or policy creates the possibility of avoiding such conditions. Moreover, Prieto fails to recognize that he cannot satisfy either of the two requirements for a protected, state-created liberty interest specified in Sandin and Wilkinson. We address these issues in turn.

### III.

We begin with Prieto's apparent belief that Sandin and Wilkinson hold that atypical and harsh confinement conditions, standing alone, can give rise to a state-created liberty interest. Noting that Wilkinson held that the conditions at the Ohio supermax imposed an atypical hardship under "any plausible

---

[4] Wilkinson went on to hold that a new Ohio law provided the inmates with constitutionally sufficient process. Wilkinson, 545 U.S. at 228-29.

baseline," 545 U.S. at 223, Prieto asserts that because the conditions on Virginia's death row are just as harsh as those in Wilkinson, he too must have a liberty interest.  But the view that prison conditions, simply by virtue of their severity, give rise to a protected liberty interest misreads Sandin, Wilkinson, and the cases that preceded them, and overlooks our binding circuit precedent.

Prieto reads Sandin as "abandon[ing]" the Supreme Court's prior teaching in Meachum that a plaintiff must point to a state statute, regulation or policy in order to "establish a liberty interest."  Appellee's Br. 17.  But the Sandin Court did no such thing.  Rather, in Sandin, the Court expressly embraced this portion of Meachum, noting that "[t]he time ha[d] come to return to the due process principles . . . correctly established in . . . Meachum."  Sandin, 515 U.S. at 483.  What the Sandin Court did do was reject some dicta in Meachum suggesting that any mandatory language in a regulation "created an absolute right to . . . certain substantive procedures."  Id. at 481.  Because not all such policies are "designed to confer rights on inmates," id. at 482, Sandin added an additional showing necessary to establish a protected liberty interest.  Id. at 482.  After finding a basis for an interest or expectation in state regulations, an inmate must then demonstrate that denial of this

10

state-created interest resulted in an "atypical and significant hardship" to him. Id. at 484.

Prieto, now joined by our friend in dissent, also misreads Wilkinson. For Wilkinson does not hold that harsh or atypical prison conditions in and of themselves provide the basis of a liberty interest giving rise to Due Process protection. Rather, it was "the inmates' interest in avoiding" erroneous placement at the supermax under the state's classification regulations combined with these harsh and atypical conditions that triggered Due Process protections. Wilkinson, 545 U.S. at 224-25. The Wilkinson Court simply applied the two-prong approach established in Sandin. Thus Wilkinson neither eliminates the first prong nor implies that the "nature of th[e] conditions" alone establishes a protected liberty interest.[5] Id. at 223.

Moreover, Prieto ignores our own binding precedent rejecting his approach. In Lovelace v. Lee, 472 F.3d 174, 202 (4th Cir. 2006), we expressly recognized that Wilkinson requires a prisoner seeking to bring a procedural due process claim to satisfy the two-prong test. Relying on Wilkinson, we held that

---

[5] If Prieto's reading of Sandin and Wilkinson were correct, a state would "create" a liberty interest simply by imposing harsh confinement conditions. This outcome would not bring the Court's precedent in line with Meachum, as Sandin sought to do. Rather, it would reject the express teaching in Meachum that a state-created liberty interest does not arise simply from "conditions of confinement having a substantial adverse impact on the prisoner." 427 U.S. at 224.

11

to demonstrate a liberty interest meriting procedural due process protection, a prisoner must show (1) denial of "an interest that can arise either from the Constitution itself or from state laws or policies," and that (2) "this denial imposed on him an 'atypical and significant hardship . . . in relation to the ordinary incidents of prison life.'" Lovelace, 472 F.3d at 202 (quoting Sandin, 515 U.S. at 484). Even more recently we reaffirmed the necessity of the first prong. See Burnette v. Fahey, 687 F.3d 171, 181 (4th Cir. 2012) (explaining that a "liberty interest may arise . . . from an expectation or interest created by state laws or policies" (internal quotation marks and citation omitted)).[6]

In addition to espousing a theory contrary to Sandin, Wilkinson, and our binding circuit precedent in Lovelace and Burnette, Prieto's approach would collapse a prison conditions

---

[6] Contrary to Prieto's contention, a recent Fifth Circuit case lends him no support. See Wilkerson v. Goodwin, 774 F.3d 845 (5th Cir. 2014). There, the court held that an inmate's almost forty-year incarceration in solitary confinement, assertedly in violation of a state classification system, gave rise to a liberty interest protected by due process. Id. at 851-57. Prieto points out that the court recognized that the existence of a state-created interest turns on the nature of the deprivation "resulting from a state regulation," rather than the "language of the regulation." Id. at 852 (quotation marks and citation omitted). Yes, but in so concluding, the Fifth Circuit expressly acknowledged, as we hold, that to give rise to a due process challenge, a deprivation must "result[] from" the alleged violation of a state regulation. Id. Unlike Wilkerson, Prieto can point to no deprivation resulting from the violation of a state regulation.

12

Due Process claim into an Eighth Amendment claim.  The Eighth Amendment's prohibition on cruel and unusual punishment "appl[ies] when the conditions of confinement compose the punishment at issue."  Rhodes v. Chapman, 452 U.S. 337, 347 (1981).  Allegations that prison conditions "involve the wanton and unnecessary infliction of pain," or are "grossly disproportionate to the severity of the crime," or are "without any penological purpose" fall squarely within the ambit of the Eighth Amendment -- not the Due Process Clause.  Id.  The Eighth Amendment requires a court to examine whether prison conditions impose cruel and unusual punishment.  The Due Process clause requires a court to determine whether a state has provided prisoners with adequate process in applying prison regulations and policies.  Treating Sandin and Wilkinson as holding that confinement conditions alone trigger a Due Process claim -- without regard to whether a state policy or regulation provides the basis to challenge such conditions -- would elide that critical distinction.

Prieto thus errs in contending that harsh and atypical confinement conditions in and of themselves give rise to a liberty interest in their avoidance.[7]

---

[7] Prieto's contention that Virginia officials waived the argument that he must point to an entitlement in state regulations or statutes to establish a Due Process claim is (Continued)

13

IV.

Of course, regardless of this initial error, Prieto could still establish a basis for Due Process protection. To do so, he would need to point to a Virginia law or policy providing him with an expectation of avoiding the conditions of his confinement and demonstrate that those conditions are harsh and atypical in relation to the ordinary incidents of prison life. Prieto does neither.

A.

The record is clear that under Virginia law, a capital offender has no expectation or interest in avoiding confinement on death row. A written Virginia policy requires all capital offenders to be housed on death row prior to execution, without any possibility of reclassification. See Virginia Dep't of Corr. Operating Procedure 830.2(D)(7) ("Any offender sentenced

---

meritless. The officials contended before the district court, albeit briefly, that a liberty interest must be "created by state laws or policies" and that Prieto could not establish a right to reclassification because one does not exist under state law. Defs' Mem. in Supp. of Mot. Summ. J. 8, ECF No. 80; Defs' Resp. to Pls' Mot. Summ. J. 6, ECF No. 81. The district court clearly understood and indeed stated that the "sole issue" before it was whether Prieto's "automatic and permanent" placement in the restrictive conditions of confinement present in Virginia's death row violates Prieto's Fourteenth Amendment due process rights, and that this analysis required an initial determination of "whether a liberty interest exists." Prieto, 2013 WL 6019215, at *4.

14

to Death will be assigned directly to Death Row . . . .  No reclassification will be completed.").

This state policy forecloses any Due Process expectation or right on the part of Virginia capital offenders to any other housing assignment.  For the corollary to the requirement that a state-created liberty interest must be anchored in a state policy is that when a state policy expressly and unambiguously disclaims a particular expectation, an inmate cannot allege a liberty interest in that expectation.  That is, a court cannot conclude that death row inmates have a state-created interest in consideration for non-solitary confinement when the State's established written policy expressly precludes such consideration.

Prieto apparently regards the written Virginia policy as being of no moment, but in fact that policy eliminates his procedural Due Process claim.

B.

Nor can Prieto establish that the conditions of his confinement impose an atypical and significant hardship in relation to the ordinary incidents of prison life.[8]  Prieto

---

[8]  Of course, a court need only reach the atypicality question if an inmate has been deprived of a state-created liberty interest.  Here there has been no deprivation, because there is no state-created liberty interest.  Nevertheless, we (Continued)

15

recognizes, as he must, that the Supreme Court has yet to identify the baseline for determining whether a state regulation imposes such an atypical and significant hardship. But he raises several arguments in support of his view that the conditions of his confinement on death row satisfy the atypicality requirement.

Citing Beverati v. Smith, 120 F.3d 500, 504 (4th Cir. 1997), Prieto asserts that this court has "long explained that the ordinary incidents of prison life are established by the conditions imposed on the general prison population." Appellee's Br. 27. Prieto also contends that his conditions of confinement on death row impose an atypical hardship "relative to ordinary prison conditions" in other Virginia prisons. Id. And he argues at length that his confinement conditions "mirror" those in Wilkinson, and thus must impose an atypical and significant hardship "under any plausible baseline." Id. at 22 (quoting Wilkinson, 545 U.S. at 223); see also id. at 16, 23-27.

Prieto is wrong on all counts. First, neither in Beverati nor elsewhere have we indicated that in all cases, the relevant atypicality baseline is the "general prison population." Beverati involved inmates initially subjected to thirty days of

---

address the atypicality inquiry because it is Prieto's principal contention and was the basis for the district court's holding.

16

disciplinary segregation but thereafter retained in segregation for six more months.  Beverati, 120 F.3d at 501-02.  Only with respect to those inmates in disciplinary segregation, whose conditions of confinement were set by Maryland (not Virginia) law, did we describe the baseline as the conditions those particular inmates could expect to "experience as an ordinary incident of prison life."  Id. at 503.  What the inmates in Beverati could expect to experience and what Prieto can expect to experience differ significantly.  It should come as no surprise that the baseline does, too.  Moreover, we have never interpreted Beverati to establish the rule Prieto suggests.  Rather, we have, as Sandin instructed, stressed that the atypicality baseline should be determined "'in relation to the ordinary incidents of prison life.'"  Lovelace, 472 F.3d at 202 (quoting Sandin, 515 U.S. at 484).  Beverati simply does not stand for the broad proposition Prieto would like it to.

Second, as to Prieto's argument that the proper baseline for assessing his conditions of confinement are the "ordinary prison conditions" in the state's prisons, Wilkinson is instructive.  None of the parties in Wilkinson even suggested that "ordinary prison conditions" in other Ohio prisons provided the proper baseline for the dangerous offenders assigned to the supermax.  At oral argument in Wilkinson, counsel for both Ohio and the inmates acknowledged that they had clashed in the lower

17

courts as to the appropriate baseline for determining atypicality. But no party contended that the "ordinary prison conditions" of the general prison population constituted the appropriate baseline for assessing the confinement conditions of those dangerous prisoner plaintiffs. See generally Transcript of Oral Argument, Wilkinson v. Austin, 545 U.S. 209 (2005) (No. 04-495).[9]

Further, neither Wilkinson nor Beverati involved a discrete class of inmates who had been sentenced to death and for that reason were required by state law to be confined under particular conditions.[10] Rather, Wilkinson and Beverati found confinement conditions that were not required by a particular conviction and sentence to impose an atypical and significant

---

[9] Ohio suggested that the baseline be the security classification just below that which renders Ohio prisoners eligible for housing at the supermax. The inmates argued that the baseline should be segregated confinement units at other Ohio prisons. See Transcript at 6-7, 52.

[10] Contrary to our dissenting colleague's suggestion, confinement of the inmates in Wilkinson to the supermax was not the "automatic[]" result "of being convicted of certain offenses." Conviction of certain egregious crimes did result in automatic consideration for assignment to the supermax, but not automatic confinement there. Wilkinson, 545 U.S. at 216. In stark contrast to the case at hand, in Wilkinson a detailed written state policy governed assignment in every case. That policy set forth a highly individualized assignment procedure "based on numerous factors (e.g., the nature of the underlying offense, criminal history, or gang affiliation) but [] subject to modification at any time during the inmate's prison term." Id. at 215.

18

hardship.  These holdings certainly do not mean that similar conditions pose an atypical and significant hardship where, as here, state law does mandate that a particular conviction and sentence require confinement under such conditions.

When determining the baseline for atypicality, a court must consider whether the confinement conditions are imposed on a prisoner because of his conviction and sentence.  For conditions dictated by a prisoner's conviction and sentence are the conditions constituting the "ordinary incidents of prison life" for that prisoner.  Sandin, 515 U.S. at 484; Lovelace, 472 F.3d at 202; Beverati, 120 F.3d at 502-03.  As the Tenth Circuit recently explained, conditions "will differ depending on a particular inmate's conviction and the nature of nonpunitive confinement routinely imposed on inmates serving comparable sentences."  Rezaq v. Nalley, 677 F.3d 1001, 1012 (10th Cir. 2012).

We do not hold, or even suggest, that differences in the nature of a conviction or the length of a sentence give rise to different liberty interests.  Rather, we simply recognize, as we must, that in the unusual instances in which state law mandates the confinement conditions to be imposed on offenders convicted of a certain crime and receiving a certain sentence, those confinement conditions are, by definition, the "ordinary incidents of prison life" for such offenders.  Virginia law

19

mandates that all persons convicted of capital crimes are, upon receipt of a death sentence, automatically confined to death row. Thus, in Virginia the ordinary incidents of prison life for those inmates, including Prieto, include housing on death row.

This conclusion follows from the importance the Supreme Court has attached to the sentence of conviction in assessing possible Due Process violations. In Meachum, the Court rejected the contention that "burdensome conditions" imposed by transfer to a maximum security facility provided the basis for a Due Process claim because those conditions fell "within the normal limits or range of custody which the conviction has authorized the State to impose." Meachum, 427 U.S. at 225 (emphasis added) (quoted with approval in Sandin, 515 U.S. at 478). Similarly, in rejecting a prisoner's Due Process claim, the Sandin Court found significant the fact that the challenged confinement conditions fell "within the expected perimeters of the sentence imposed." Sandin, 515 U.S. at 485 (emphasis added). As the Court explained in Sandin and repeated in Wilkinson, a prisoner does not establish a state-created liberty interest in avoiding disciplinary segregated confinement if such confinement "does not present a dramatic departure from the basic conditions of [the inmate's] indeterminate sentence." Id. (emphasis added); Wilkinson, 545 U.S. at 223.

20

Prieto, like any other inmate, can only be deprived of that to which he is entitled. Thus, in determining whether a deprivation imposes a significant or atypical hardship on him, the court must use as its benchmark the incidents of prison life to which he is entitled. Virginia imposes death row confinement on capital offenders because of the crime they have committed and the sentence they have received. That confinement is the expected -- indeed mandated -- confinement condition flowing from the conviction and sentence. State law defines the perimeters of confinement conditions, and here state law is pellucid: tethered to the death sentence in Virginia is pre-execution confinement on death row.

V.

We do not in any way minimize the harshness of Virginia's regime. Prieto's conditions of confinement are undeniably severe. Indeed, the district court, perhaps correctly, described the isolation that characterizes Virginia's death row as "dehumanizing". Prieto, 2013 WL 6019215, at *6.[11] But the

_____

[11] We note, however, that the conditions on Virginia's death row are apparently not altogether unlike those imposed by some other states on their capital offenders. A study cited by one of Prieto's amici, the ACLU, reports as much. See Mark D. Cunningham & Mark P. Vigen, Death Row Inmate Characteristics, Adjustment, and Confinement: A Critical Review of the Literature, 20 Behav. Sci. & L. 191, 204 (2002).

21

Supreme Court has long held, as it did in Wilkinson, that state correctional officials have broad latitude to set prison conditions as they see fit since "[p]rison security, imperiled by the brutal reality of prison gangs, provides the backdrop of the state's interest." 545 U.S. at 227. Recently the Court emphasized once more that "[t]he difficulties of operating a detention center must not be underestimated by the courts," and that "correctional officials . . . must have substantial discretion to devise reasonable solutions to the problems they face." Florence v. Bd. of Chosen Freeholders, 132 S. Ct. 1510, 1515 (2012).

Of course, the Supreme Court could prescribe more rigorous judicial review of state statutes and regulations governing prison confinement conditions. But it has not. Concerned with eliminating "disincentives for States to 'codify' prison management procedures," the Sandin Court adopted an approach that would encourage States to codify their policies regarding treatment and confinement of inmates. 515 U.S. at 482. This approach, reaffirmed in Wilkinson, provides inmates and prison administrators with clear notice of a prisoner's rights, but it also permits a given state to codify procedures establishing very restrictive confinement conditions. The judgment that this trade-off strikes the correct balance between the dictates of the Due Process Clause and the pressures on state correctional

22

systems is one that the Supreme Court has made and we cannot disturb. Of course, the Court may one day alter its approach to the Due Process Clause. But unless and until the Court retreats from Sandin and Wilkinson, a procedural Due Process claim like that offered by Prieto fails.

For the foregoing reasons, we reverse the judgment of the district court.[12]

REVERSED

---

[12] Because 42 U.S.C. § 1988(2) authorizes the award of attorney's fees only to a "prevailing party," we must also reverse the order awarding costs and attorney's fees to Prieto.

23

WYNN, Circuit Judge, dissenting:

A unanimous Supreme Court told us in no uncertain terms that prisoners have a liberty interest in avoiding indefinite, highly restrictive imprisonment. Wilkinson v. Austin, 545 U.S. 209, 220–21 (2005). And the Supreme Court told us that in determining whether such a liberty interest exists, we must focus on the "the nature of those conditions themselves in relation to the ordinary incidents of prison life." Id. at 223 (quotation marks omitted).

The Supreme Court found the conditions in Wilkinson sufficiently egregious that "taken together[,] they impose an atypical and significant hardship within the correctional context . . . [and thereby] give rise to a liberty interest in their avoidance." Id. at 224. In other words, the restrictive conditions could be imposed—but not without procedural safeguards such as notice and an opportunity to be heard.

This case presents conditions of confinement strikingly similar to, and arguably more egregious than, those in Wilkinson. I would therefore follow Wilkinson and find Plaintiff Alfred Prieto entitled to at least some modicum of procedural due process. In my view, the majority opinion reads Wilkinson unnecessarily narrowly in signing off on Prieto's automatic, permanent, and unreviewable placement in the highly

24

restrictive conditions of Virginia's death row.  Accordingly, I respectfully dissent.

I.

A.

"The Fourteenth Amendment's Due Process Clause protects persons against deprivations of life, liberty, or property; and those who seek to invoke its procedural protection must establish that one of these interests is at stake."  Id. at 221.

In Wilkinson, the Supreme Court found a prisoner's liberty interest at stake and got there by noting that "the touchstone of the inquiry into the existence of" the liberty interest in avoiding restrictive conditions of confinement was not the language of regulations "but the nature of those conditions themselves in relation to the ordinary incidents of prison life."  545 U.S. at 222 (citation and quotation marks omitted). The centerpiece of the Court's Wilkinson opinion, therefore, was an analysis of the conditions themselves.

Nowhere in Wilkinson did the Supreme Court parse the language of any law or regulation or otherwise suggest that written words governing the conditions of confinement are the linchpins to finding a liberty interest.  See id.  Instead, the Court analyzed the conditions themselves and then held that "taken together they impose an atypical and significant hardship

25

within the correctional context. It follows that [the prisoners] have a liberty interest in avoiding" them. <u>Id.</u> at 224. In other words, the Supreme Court looked not at verbiage but at the facts on the ground, comparing the conditions at issue with typical conditions. And finding the conditions at issue atypically harsh, the Court held that a prisoner subjected to the conditions is due at least an informal notice and hearing before he is subjected to them.[1]

Several conditions caught the Supreme Court's eye in <u>Wilkinson</u>: the solitary nature of the confinement and near complete prohibition on human contact; the lack of stimuli, with exercise limited to one hour per day in a small indoor room; the potentially indefinite period of the placement—with only an annual review after the initial thirty-day review; and potential disqualification of inmates otherwise eligible for parole. <u>See</u> <u>Wilkinson</u>, 545 U.S. at 223-24. The Supreme Court looked at the totality of the conditions and held that "taken together they impose an atypical and significant hardship within the correctional context." <u>Id.</u> at 224.

---

[1] The Supreme Court did not, however, hold that the conditions themselves were unconstitutional and needed to be changed; that would be a separate, Eighth Amendment inquiry. Nor would I hold so here, not least because, as in <u>Wilkinson</u>, that is not before us.

26

In this case, the conditions of confinement essentially mirror those in Wilkinson. Prieto is deprived of almost all human contact, even cell-to-cell contact with other death row inmates. His conditions of confinement are largely devoid of stimuli: He must remain in his small single cell for twenty-three hours a day, except for one hour five days per week, when he may exercise in a small enclosure with a concrete floor and no exercise equipment. And Prieto's confinement on death row is indefinite: No opportunity for review of the placement exists.

In some respects, Prieto's conditions are actually more restrictive than those in Wilkinson. For example, Prieto's cell is smaller than the cells in Wilkinson. Unlike the prisoners in Wilkinson, Prieto has no opportunity for group programming or religious services. And Prieto has fewer opportunities for exercise.

One condition at issue in Wilkinson but absent here is disqualification for parole. Specifically, inmates otherwise eligible for parole became ineligible when placed into the restrictive supermax confinement at issue in Wilkinson. 545 U.S. at 224. But the Supreme Court in no way limited its holding only to those (few) inmates who would otherwise be eligible for parole but for their supermax confinement. And I agree with the Seventh Circuit that any contention that Wilkinson turned on the (in)eligibility for parole constitutes

27

"far too crabbed a reading of the decision." Westefer v. Snyder, 422 F.3d 570, 590 (7th Cir. 2005).

In the end, the Supreme Court felt "satisfied" that the conditions in Wilkinson, taken together, "impose[d] an atypical and significant hardship under any plausible baseline." Wilkinson, 545 U.S. at 223 (emphasis added). The Supreme Court therefore felt no need to identify the baseline to which the conditions should be compared. Id.

Here, I feel "satisfied" that Prieto's conditions of confinement, which are strikingly similar to those in Wilkinson, when taken together "impose[] an atypical and significant hardship under any plausible baseline." Id. And if the Supreme Court did not need to identify a particular baseline to reach such a conclusion, neither do I.

B.

In my view, the majority opinion seeks to engage in just the sort of "parsing" that the Supreme Court moved away from with Sandin and Wilkinson. For example, the majority opinion understands Sandin and Wilkinson as holding that a prisoner must first show that a written prison regulation gives rise to a protected liberty interest before reaching the atypical and significant hardship inquiry. See ante at 6-14. But following that logic to its end would mean that prisoners have no interest in avoiding even extreme hardships so long as a state simply

28

removes all delineating prison regulations or expressly disclaims any liberty expectation. Yet it was precisely this type of "parsing" and resulting "disincentive[s] for States to promulgate procedures for prison management" that the Supreme Court sought to curtail. Wilkinson, 545 U.S. at 222.

The majority opinion also "re-organizes" the Supreme Court's Wilkinson analysis in misleading ways. For example, the only "threshold question" the Supreme Court identified in Wilkinson was whether "the inmates establish[ed] a constitutionally protected liberty interest"—not the sentence fragment from a different paragraph that the majority opinion redlines in to play the part of the "threshold question." 545 U.S. at 221. A second example: The majority opinion contends that the risk of erroneous placement coupled with the harsh conditions "triggered" due process protections. Ante at 11. Yet in Wilkinson, the Supreme Court considered the erroneous placement issue only after it had already held that a liberty interest in avoiding the harsh conditions existed, as a factor for determining whether the procedures in place sufficed. 545 U.S. at 224-25.

The majority opinion places much emphasis on the fact that because all capital offenders in Virginia automatically land on death row, Prieto has no interest in avoiding its conditions and thus no due process rights. See ante at 14-15. In this

29

respect, too, Prieto's case overlaps with <u>Wilkinson</u>: The Supreme Court noted that some defendants there were automatically assigned to the restrictive supermax confinement as a consequence of being "convicted of certain offenses." <u>Wilkinson</u>, 545 U.S. at 216. But the Supreme Court in no way excluded those inmates from the ambit of its holding or otherwise suggested that because of their automatic assignment, they had no liberty interest in avoiding the restrictive supermax conditions.

Instead, the Supreme Court broadly stated that "the touchstone of the inquiry into the existence of a protected, state-created liberty interest in avoiding restrictive conditions of confinement is not the language of regulations regarding those conditions but the nature of those conditions themselves 'in relation to the ordinary incidents of prison life.'" <u>Id.</u> at 221 (citation omitted). In my view, the majority opinion's myopic search of a written regulation betrays this touchstone and "stray[s] from the real concerns undergirding the liberty protected by the Due Process Clause." <u>Sandin</u>, 515 U.S. at 483.

I agree with the majority opinion that the Supreme Court has been anything other than consistent in its approach to prisoner due process cases. The Supreme Court suggested that prisoner liberty interests exist whenever something is

30

sufficiently important. See, e.g., <u>Morrissey v. Brewer</u>, 408 U.S. 471 (1972). Then it indicated that liberty interests are a function of mandatory verbiage in written regulations. <u>See, e.g.,</u> <u>Wolff v. McDonnell</u>, 418 U.S. 539 (1974). Later the Court rethought that approach, holding that such verbiage is, in fact, not so important after all. <u>See, e.g.,</u> <u>Wilkinson</u>, 545 U.S. 209. It is, therefore, not surprising that lower courts have not found it easy to agree on how best to read the due process tea leaves in the prison context. <u>See</u> <u>ante</u> at 7 (comparing <u>Chappell v. Mandeville</u>, 706 F.3d 1052 (9th Cir. 2013), with <u>Tellier v. Fields</u>, 289 F.3d 69 (2d Cir. 2000)).

Finally, the majority opinion suggests that an analysis like mine bucks controlling circuit precedent, and particularly <u>Lovelace v. Lee</u>, 472 F.3d 174, 202 (4th Cir. 2006). Yet that case does not present the obstacle the majority opinion portrays. In <u>Lovelace</u>, we admonished the district court for its failure to address the plaintiff's due process claim and remanded the matter to the district court for a determination "in the first instance." 472 F.3d at 203. Therefore, even assuming that one could not square my view with <u>Lovelace</u>, anything <u>Lovelace</u> said about the due process claim seems to be only dictum, and in any event the assertion that the case "reject[ed] [my] approach" is gross overstatement. <u>Ante</u> at 11. Moreover, to the extent <u>Lovelace</u> parts ways with <u>Wilkinson</u>, we

31

certainly "have no authority to overrule a Supreme Court decision." Scheiber v. Dolby Labs., Inc., 293 F.3d 1014, 1018 (7th Cir. 2002) (Posner, J.).

In sum, taking the Supreme Court at its word, it told us that we are not to parse written regulations but rather that the "touchstone of the inquiry into the existence of a protected, state-created liberty interest in avoiding restrictive conditions of confinement is not the language of regulations regarding those conditions but the nature of those conditions themselves in relation to the ordinary incidents of prison life." Wilkinson, 545 U.S. at 223 (quotation marks omitted). Here, as in the strikingly similar Wilkinson, the conditions are sufficiently egregious that "taken together[, they] impose an atypical and significant hardship within the correctional context" when compared to "any plausible baseline" and thus "give rise to a liberty interest in their avoidance." Wilkinson, 545 U.S. at 223.

That being said, there is no necessary tension between the existence of a liberty interest in avoiding restrictive conditions of confinement and, for example, the state's penological interests or the fact that we are dealing with a prison and not a resort. As the Supreme Court has stated, "harsh conditions may well be necessary and appropriate in light of the danger that high-risk inmates pose both to prison

32

officials and to other prisoners.  That necessity, however, does not diminish our conclusion that the conditions give rise to a liberty interest in their avoidance."  Id.


II.

Once a liberty interest is established, the question then becomes what process is due to protect it.  To determine whether procedural safeguards sufficed to protect the liberty interest in Wilkinson, the Supreme Court looked to three factors:

> "First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail."

Id. at 224–25 (quoting Mathews v. Eldridge, 424 U.S. 319, 335 (1976)).  Applying those factors, the Supreme Court held that "informal, nonadversary procedures" informing inmates of the factual basis for their restrictive placement, a fair opportunity for rebuttal, and regular review sufficed to comport with due process.  Id. at 229.

Here, any attempt to apply the salient factors would be in vain—because Virginia affords capital offenders no process. Virginia tries to offer up its sentencing procedures as all the due process required.  Of course, the same could be said of all

33

prisoners. Yet no Supreme Court case has ever suggested that is so. Further, under such a regime, sentencing discretion could result in two defendants who commit the same crime and possess the same aggravating factors receiving vastly different conditions of confinement and procedural safeguards. The conviction and sentence alone, therefore, do not represent a principled manner for determining due process rights.[2]

At the end of the day, all of this ink is being spilled over whether Virginia needs to provide minimalist procedural safeguards like those in <u>Wilkinson</u> to less than ten prisoners— the current number of inmates on Virginia's death row. Again, the "harsh conditions may well be necessary and appropriate" for these prisoners. <u>Wilkinson</u>, 545 U.S. at 223. But that "does not diminish" the conclusion that "the conditions give rise to a liberty interest in their avoidance"—and that all that would be required to comport with due process would be informal notice and an informal opportunity to be heard. <u>Id.</u> at 224. These procedural safeguards, in my view, Prieto should have.

---

[2] The majority opinion purports that it does "not hold, or even suggest, that differences in the nature of a conviction or the length of a sentence give rise to different liberty interests." <u>Ante</u> at 19. But allowing Virginia to confine Prieto automatically, based on his death sentence, to highly restrictive conditions for the duration of his incarceration (so far, almost seven years) and without any opportunity for review does just that.

III.

For the reasons above, I would affirm the district court's judgment and, accordingly, respectfully dissent.