NIEMEYER, Circuit Judge, dissenting:
In this case, Virginia death-row inmates are challenging conditions of confinement that have not existed for over three years - raising a concern that this case could now be only advisory. Nonetheless, the district court sustained their challenge and ruled in February 2018 that pre-2015 death-row conditions violated the Eighth Amendment. Further, it entered an injunction prohibiting a return to those conditions.
Five inmates on Virginia's death row commenced this action in 2014 challenging the conditions of confinement then in effect on death row - namely, that they were housed in 71 square-foot cells for 23 hours per day and allowed limited contact with other persons. Those restrictive conditions were imposed following serious incidents among death-row inmates in the 1980s and 1990s, when the inmates were allowed to congregate with each other for extended periods.
In early 2011, the newly appointed Director of the Virginia Department of Corrections ("VDOC"), Harold Clarke, decided to assess whether a new policy allowing death-row inmates to have more contact with others could again be offered. His endeavor was grounded in his professional belief that "enhancing offenders' quality of life, when feasible, benefits staff and offenders alike." During the next year or two, Director Clarke and David Robinson, VDOC's second highest official, looked at confinement conditions imposed on death-row inmates in other states and concluded that some relaxation of restrictions could safely be implemented on Virginia's death row. The decision to proceed with less restrictive conditions, however, was put on hold in late 2012, on the advice of VDOC's lawyers, after one of the death-row inmates challenged the procedure by which he was automatically assigned to death row. That inmate obtained relief from the district court, but only for himself. While VDOC pursued a successful appeal of that case, other inmates on death row commenced this action against Director Clarke and the Warden of the Sussex I State Prison (collectively, "VDOC") in November 2014, challenging more generally the conditions of confinement on death row, mainly under the Eighth Amendment's Cruel and Unusual Punishments Clause. Despite the new litigation, however, Director Clarke decided in the spring of 2015 to move forward with his decision to change the conditions on death row. Thereafter, VDOC adopted new Operating Procedure *369 425.A, which substantially increased the contact that death-row inmates were allowed to have with their family members and each other and increased the inmates' recreational opportunities. In addition, beginning in the fall of 2015, VDOC undertook a $ 2 million construction project, creating a new dayroom and a new outdoor recreation yard for the death-row inmates. The plaintiffs in this case now concede that the 2015 changes rendered the conditions on Virginia's death row constitutional.
Nonetheless, the district court, at the plaintiffs' urging, continued the litigation and issued a declaratory judgment that the prior conditions - the pre-2015 conditions at Sussex I - violated the inmates' Eighth Amendment rights. And it also issued an injunction prohibiting VDOC from returning to the prior conditions.
VDOC has appealed the district court's order, contending (1) that the prior conditions did not violate the Eighth Amendment and (2) that, in any event, there was no basis for the district court to have issued a declaratory judgment and an injunction, especially under the strict standards imposed for such relief by the Prison Litigation Reform Act of 1995 ("PLRA"), 18 U.S.C. § 3626. The majority surprisingly rejects VDOC's modest arguments, concluding that despite the fact that the allegedly unconstitutional conditions have not existed on Virginia's death row for some three-and-a-half years, a prospective injunction should nonetheless be affirmed.
The record in this case clearly indicates that the entry of equitable relief was inappropriate because there was absolutely no reason to expect that VDOC was or is likely to return to the former conditions, having (1) adopted a policy for change; (2) invested considerable amounts of time in making changes; (3) formally adopted new procedures and regulations; and (4) expended substantial amounts of money improving the physical conditions for the inmates. VDOC has stated that it does not intend to return to former conditions, with Director Clarke attesting to his belief that to do so would be a move in the "wrong direction."
Moreover, the district court's judgment is especially misguided in the face of the strict standards that Congress imposed in the PLRA for this type of litigation:
Prospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs. The court shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right , and is the least intrusive *370 means necessary to correct the violation of the Federal right.
18 U.S.C. § 3626(a)(1) (emphasis added). It simply cannot be claimed that the district court's award of equitable relief in 2018 was "necessary to correct" a violation of a federal right when the 2015 changes had, by the plaintiffs' own concession, already corrected the alleged violation and no new violation was in any way being threatened.
Failing to recognize and therefore correct the district court's error in granting relief that was plainly unavailable, the majority proceeds further, reaching into the realm of advisory opinions to conclude that the pre-2015 conditions of confinement on Virginia's death row violated the Eighth Amendment. In doing so, however, it remarkably ignores binding Fourth Circuit precedent.
It is readily apparent that the district court's judgment and the majority's affirmance cannot be seen as "the least intrusive means necessary to correct the [alleged] violation." 18 U.S.C. § 3626(a)(1).
I
In the 1980s and 1990s, Virginia's death-row inmates were housed in the Mecklenburg Correctional Center and allowed to congregate, eat, recreate, and work together. During that period, however, several serious incidents followed from such an "open housing" policy. In May 1984, six death-row inmates escaped, and it took weeks to recapture them all. The final two to be taken back into custody were serial murderers who were ultimately captured in Philadelphia. Moreover, while that manhunt was ongoing, prison officials discovered a "cache of homemade weapons and other contraband inside death row." In 1988, two death-row inmates got into a fight, during which one inmate threw the other to the floor, knocking him unconscious. In 1992, a death-row inmate died from a heroin overdose. And in 1993, another death-row inmate committed suicide after smuggling contraband into the death-row unit. Following incidents such as these, VDOC moved death row to Sussex I State Prison and implemented more restrictive conditions of confinement, substantially limiting the inmates' contacts with each other and with others. A VDOC official has noted that, since those changes were made, "there have been virtually no serious security-related incidents on death row."
The death-row cells at Sussex I are essentially the same as the cells used to house the general prison population, except that death-row inmates do not share their cells with another inmate. Each cell measures 71 square feet, with a 10.5-foot high ceiling, and is furnished with a steel bed, a small shelf, a toilet, a sink, and a mirror. The restrictions on contacts, however, are more restrictive on death-row inmates than those imposed on the general prison population. At the time that the plaintiffs commenced this action, the conditions of confinement on death row were governed by Operating Procedure 460.A and Sussex I's Institutional Rules and Regulations for Offenders, both of which became effective in early 2010. Under those procedures and regulations, inmates spent almost 23 hours a day in their cells, but they were permitted to have a television and CD player there. They were also allowed to purchase the same commissary items as general-population inmates, to request materials from the prison's library, and to order approved publications. They were allowed one hour of outdoor recreation five days per week, which they spent in individual enclosures slightly larger than their cells. During outdoor recreation, the inmates were separated but could converse with each other and coordinate their exercises. The inmates were also allowed to leave their cells for a ten-minute shower three times per week, and two inmates were permitted to perform the institutional jobs of houseman and barber. As for contacts with other persons - apart from the one-hour recreational period - death-row inmates were permitted to make telephone calls from their cells seven days per week; to have noncontact visits with approved family members on weekends and holidays; to have contact visits with family members "when extreme circumstances exist[ed]"; to have face-to-face meetings with their attorneys in a room designated for that purpose; to have religious visits with the prison's chaplain and other approved religious volunteers; and to converse with prison staff as they visited the unit. Specifically, corrections officers assigned to death row made rounds through the unit every 30 minutes to perform security checks, and during their rounds they often conversed with inmates. Medical personnel came through the unit twice each *371 day to assess whether an inmate had a medical need that should be addressed by a physician. Nurses visited death row twice a day to distribute required medications. Mental health professionals visited the unit at least once per week, speaking with the inmates about any mental health issues and looking for signs of mental distress. Case counselors - staff members who helped the inmates with paperwork associated with prison life - visited the unit on a daily basis. And prison administrators, including the Warden and Assistant Warden, were encouraged to make rounds through death row on a weekly basis to check on the inmates' welfare.
In late 2010, Harold Clarke was appointed the new Director of VDOC, and soon after his appointment he resolved to assess the existing policies and procedures "to determine whether and where more latitude might be afforded to Virginia's death row offenders." Based on his 35 years of experience, he believed that Virginia's conditions of confinement satisfied the requirements of the Eighth Amendment, but he also believed that more relaxed policies could and should be applied, as he was convinced "that enhancing offenders' quality of life, when feasible, benefits staff and offenders alike." To this end, Director Clarke began discussing making changes to Virginia's death row with David Robinson, who was at first the Regional Director responsible for Sussex I but soon after became the Chief of Corrections Operations, VDOC's second highest official. After looking at the policies governing Nebraska's death row, which Clarke had previously helped to oversee in his capacity as the head of that State's corrections department, and after having conversations with a high-ranking prison official in Tennessee, Clarke and Robinson became convinced that VDOC could safely implement less restrictive conditions on Virginia's death row.
Their efforts were interrupted, however, when one of the death-row inmates commenced an action challenging the procedures relating to his conditions of confinement, and VDOC's lawyers advised Director Clarke not to make any changes to death row while the suit was ongoing. Although the district court ruled in the inmate's favor in that case, we reversed the ruling. See Prieto v. Clarke , 780 F.3d 245 (4th Cir. 2015). Nonetheless, while that appeal was pending, other inmates commenced this action in November 2014, challenging their conditions of confinement under the Eighth and Fourteenth Amendments. Notwithstanding their litigation, however, Director Clarke decided to move forward with developing and implementing his plan to change the conditions on Virginia's death row. He explained that he decided that VDOC "should move ahead and do what we thought, what we thought was the right thing to do, what we wanted to do all along." And he decided to do so "despite the new lawsuit that had been filed by the present Plaintiffs" because VDOC "did not want to waste any additional time waiting for this litigation, too, to come to a conclusion."
Thereafter, VDOC adopted new Rules and Regulations for Death Row Offenders and a new Operating Procedure 425.A, making a host of significant changes to the conditions of confinement. Under the new procedures and regulations, inmates were allowed to have contact visits with family members once per week; they were given an hour of indoor recreation every day, in addition to an hour and one-half of outdoor recreation; they were allowed to congregate on a limited basis in the outdoor recreation area; they were allowed to participate in a group behavioral program; and their showers were increased to every day and the time enlarged to *372 fifteen minutes. In addition, VDOC spent approximately $ 2 million constructing a new inside dayroom and a new outdoor recreation yard, thereby enabling the inmates to congregate during both recreation periods. The new dayroom was equipped with a 60-inch television, two tables with seating, games of the type available to inmates in the general population, a kiosk from which inmates could send email and purchase music, and a telephone. The plaintiffs have conceded that these new 2015 conditions of confinement are constitutional.
Notwithstanding the improvements, the plaintiffs continued to press for a ruling that the prior conditions violated the Eighth Amendment, and they also continued to seek an injunction to prohibit VDOC from returning to the prior conditions. While VDOC clearly expressed its intent not to return to prior conditions, it refused to commit that it would never do so because it did not wish to preclude future changes, should changed circumstances require them. But Director Clarke explained emphatically that he did not "know of any situation today that will cause me to have to go back to where we came from. We will manage in place." He explained his view that going back to the prior conditions would be "going [in] the wrong direction" and "going against what we espouse."
On cross-motions for summary judgment, the district court ruled in 2018 that the pre-2015 conditions violated the Eighth Amendment. It held that "the pre-2015 conditions of confinement forced on plaintiffs created, at the least, a significant risk of substantial psychological and emotional harm" and that VDOC had been deliberately indifferent to that risk of harm. The court also concluded that the plaintiffs had demonstrated an entitlement to a declaratory judgment and injunctive relief, rejecting VDOC's argument that the PLRA requires that there be an "ongoing violation" to justify such relief and instead concluding that the PLRA should be interpreted as consistent with "the background equitable rule that courts have the authority to issue prospective relief even in the absence of an ongoing violation." Moreover, the court concluded that the plaintiffs had established a need for injunctive relief because (1) VDOC's adoption of the new conditions was influenced in part by the litigation; (2) there were no legal barriers preventing VDOC from returning to the pre-2015 conditions; and (3) VDOC had declined to give a "nonreversion promise."
From the district court's order dated February 21, 2018, VDOC filed this appeal, and the majority now affirms without engaging in any meaningful analysis of the most critical issue.
II
While the main issue in this appeal is whether there is any basis to justify the issuance of a declaratory judgment and injunction prohibiting the State from returning to prior conditions, it is relevant to note that this court previously held that conditions similar to, or even more restrictive than, the prior conditions in this case did not violate the Eighth Amendment. See Mickle v. Moore , 174 F.3d 464, 471-72 (4th Cir. 1999) (holding that no violation of the Eighth Amendment was shown for conditions of confinement where inmates were confined to their cells for 23 hours per day without a radio or television, received "only five hours of exercise per week," and were not allowed to "participate in prison work, school, or study programs"); Sweet v. S.C. Dep't of Corr ., 529 F.2d 854, 861 (4th Cir. 1975) (en banc) ("[I]solation from companionship, restriction on intellectual stimulation[,] and prolonged inactivity ... will not render segregated confinement unconstitutional *373 absent other illegitimate deprivations," even if the "segregated confinement is prolonged and indefinite" (cleaned up)). The majority refuses to recognize these precedents, explaining that the record contains new academic literature that was not available when our precedents were decided. Ante at 358-59. But intervening academic literature does not empower a panel to overrule binding precedent.
The majority also cites two Supreme Court cases in support of its refusal to apply Fourth Circuit precedents, but neither case provides any support. In Rhodes v. Chapman , 452 U.S. 337, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981), the Court upheld conditions of confinement that involved double-celling of inmates in 63-square-foot cells. And in Wilkinson v. Austin , 545 U.S. 209, 125 S.Ct. 2384, 162 L.Ed.2d 174 (2005), where the Court was presented with a challenge to procedures for assigning inmates to a highly restrictive form of solitary confinement in Ohio, it held that inmates had a liberty interest in not being assigned to such confinement but that Ohio's procedures were constitutional. Neither case can be cited to suggest that our prior cases need to be overruled or that analogous conditions violate the Eighth Amendment.
In short, the majority's Eighth Amendment ruling is unprecedented and runs the risk of interfering with the wide use of supermax-type prisons, including the federal supermax prisons in Colorado and Illinois where conditions are more restrictive than those that were imposed on Virginia's death row prior to the 2015 charges. For instance, at the U.S. Penitentiary ADX Florence, in Fremont County, Colorado, inmates are housed in solitary confinement without the ability to communicate with other inmates, either during the 23-hour period while they are in their cells or during a one-hour recreation period. And visits are more restricted than were visits to inmates on Virginia's death row before 2015.
But my opinion does not rest on this disagreement with the majority. Rather, this disagreement only demonstrates how far afield the majority has moved in upholding the injunction against VDOC in the circumstances of this case, where the present conditions of confinement are concededly constitutional and the pre-2015 conditions would undoubtedly have been upheld under binding Fourth Circuit precedent.
With these preliminary observations made, I now turn to address the lack of any basis for the entry of equitable relief in the circumstances of this case.
III
VDOC's primary position on appeal is that the district court "should have dismissed this case for lack of a remedy." It argues that the PLRA prohibits the entry of prospective relief "in the absence of any ongoing constitutional violation" and that, even under traditional principles governing equitable relief, there is no basis for awarding such relief here because there is not a "reasonable likelihood that the prior conditions of confinement will be reinstated." VDOC emphasizes that "it is undisputed that the corrections officials have no intention of reinstating the old conditions" and argues that "[i]t is purely speculative that the district court's injunction will serve any purpose other than forcing the corrections officials to return to court in order to vacate the injunction in two years," as authorized by the PLRA. See 18 U.S.C. § 3626(b)(1).
The Plaintiffs make a strained argument that the PLRA somehow only limits the "scope of an injunction" and therefore did *374 not restrict the district court's issuance of the injunction in this case. But in general they rely on the district court's broad equitable discretion to grant injunctions.
Congress enacted the PLRA "in 1996 in the wake of a sharp rise in prisoner litigation in the federal courts," and the Act "contains a variety of provisions designed to bring this litigation under control." Woodford v. Ngo , 548 U.S. 81, 84, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006). As directly relevant here, "the PLRA attempt[ed] to eliminate unwarranted federal-court interference with the administration of prisons," id . at 93, 126 S.Ct. 2378, by "establish[ing] standards for the entry and termination of prospective relief in civil actions challenging prison conditions," Miller v. French , 530 U.S. 327, 331, 120 S.Ct. 2246, 147 L.Ed.2d 326 (2000).
Specifically, the PLRA provides that "[p]rospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs." 18 U.S.C. § 3626(a)(1)(A) (emphasis added). The term "prospective relief" is in turn defined as "all relief other than compensatory monetary damages." Id . § 3626(g)(7). The Act provides further that "[t]he court shall not grant or approve any prospective relief unless the court finds that such relief [1] is narrowly drawn, [2] extends no further than necessary to correct the violation of the Federal right, and [3] is the least intrusive means necessary to correct the violation of the Federal right." Id . § 3626(a)(1)(A) (emphasis added). In addition, if prospective relief is granted in the absence of such a finding by the court, the defendant is "entitled to the immediate termination of any prospective relief." Id . § 3626(b)(2). Otherwise, prospective relief "shall be terminable upon the motion of any party or intervenor ... 2 years after the date the court granted or approved [such] relief," id . § 3626(b)(1), unless "the court makes written findings based on the record that prospective relief remains necessary to correct a current and ongoing violation of the Federal right, extends no further than necessary to correct the violation of the Federal right, and that the prospective relief is narrowly drawn and the least intrusive means to correct the violation," id . § 3626(b)(3).
It is thus patently clear that under the PLRA, before a district court can grant equitable relief with respect to prison conditions, there must be a "violation of [a] Federal right" in need of correction . Yet, in this case, it is undisputed that VDOC had itself corrected the alleged Eighth Amendment violation more than two years before the district court awarded prospective relief. That should have ended the matter. Under the plain terms of the PLRA, the district court was barred from awarding prospective relief in the circumstances of this case.
The majority, however, fails to analyze meaningfully whether prospective relief was "necessary to correct" the Eighth Amendment violation alleged by the plaintiffs. Rather, it undertakes only to address and reject a linguistic argument made by VDOC in its brief, without addressing the explicit requirement of the PLRA itself that equitable relief, including an injunction, can only be issued "to correct [a] violation of [a] Federal right." 18 U.S.C. § 3626(a)(1)(A).
Moreover, even on the untenable proposition implicitly maintained by both the district court and the majority that the PLRA adds nothing to the traditional equitable principles for issuing injunctions, the record shows that the conditions of confinement that prompted the plaintiffs to commence this action were highly unlikely *375 to recur, thus eliminating any justification for the entry of an injunction.
The Supreme Court has long recognized that "[t]he sole function of an action for injunction is to forestall future violations." United States v. Or. State Med. Soc'y , 343 U.S. 326, 333, 72 S.Ct. 690, 96 L.Ed. 978 (1952). Thus, to obtain an injunction, there must be "a real threat of future violation or a contemporary violation of a nature likely to continue or recur." Id . (emphasis added). In this type of "forward-looking action, ... an examination of a great amount of archaeology is justified only when it illuminates or explains the present and predicts the shape of things to come." Id . (cleaned up); see also City of Los Angeles v. Lyons , 461 U.S. 95, 111, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983) (explaining that "[t]he equitable remedy [of an injunction] is unavailable absent a showing of irreparable injury, a requirement that cannot be met where there is no showing of any real or immediate threat that the plaintiff will be wronged again " (emphasis added)).
More specifically, in United States v. W.T. Grant Co. , the Supreme Court recognized that there may be instances where a defendant cannot meet its burden of demonstrating that its voluntary cessation of its allegedly illegal conduct has mooted the case, but where - in light of the defendant's changed conduct - the plaintiff also cannot meet its burden of establishing a need for an injunction. 345 U.S. 629, 633, 73 S.Ct. 894, 97 L.Ed. 1303 (1953). In this type of circumstance, the Court made clear that plaintiffs have the burden of "satisfy[ing] the court that relief is needed" and that "[t]he necessary determination is that there exists some cognizable danger of recurrent violation, something more than the mere possibility which serves to keep the case alive ." Id . (emphasis added). Where the record discloses "no significant threat of future violation," id. at 635, 73 S.Ct. 894, the plaintiff fails to carry its burden of establishing that injunctive relief is warranted.
In this case, it is especially curious that the district court could genuinely believe that there was a real threat of a future violation when it had previously observed in this litigation that VDOC had made "significant, costly, and concrete changes to numerous facets of plaintiffs' conditions of confinement," spending nearly $ 2 million on both outdoor and indoor recreation areas that were constructed specifically to allow death-row inmates to have congregate activities in a secure environment. The district court had also observed that the new operating procedure "reach[ed] almost every facet of inmate life." And, in addition to those observations, the court had before it undisputed sworn statements by Director Clarke that he was committed to bringing meaningful changes to Virginia's death row from early in his tenure, having previously overseen a less restrictive death-row environment in Nebraska.
Thus, the actions taken by VDOC "did not consist merely of pretentions or promises" but instead represented "an overt and visible reversal of policy, carried out by extensive operations which have every appearance of being permanent." Or. State Med. Soc'y , 343 U.S. at 334, 72 S.Ct. 690. VDOC's actions - especially when combined with the sworn statements from its top two officials that they believed such changes were in the best interests of both the inmates and the department - conclusively show that there was and is no "real threat" or "cognizable danger" that the alleged Eighth Amendment violation that prompted the plaintiffs to commence this action in 2014 will recur. Indeed, after years of successfully operating Virginia's death row under the new conditions, it frankly borders on the preposterous to *376 presume that, were it not for the district court's injunctive relief, Director Clarke and his team would upend all the changes that they had made to Virginia's death row and reimpose the precise combination of conditions challenged in this action.
Presumably because of this overwhelming evidence, the majority affirms by choosing to defer blindly to the district court's "factual" finding there was a "cognizable danger of recurrent violation." But in doing so, the majority not only fails to recognize that such a finding is a mixed question of law and fact that justifies greater scrutiny by us, see W.T. Grant , 345 U.S. at 632, 73 S.Ct. 894, but it also accepts uncritically the three reasons given by the district court. A critical analysis, however, would quickly have undermined those reasons' purported value.
First, the district court gave as a reason for the injunction that "there is no legal barrier to defendants' returning to the pre-2015 conditions nor is there any pre-implementation mechanism for plaintiffs to challenge such a return." But that conclusion could hardly have been determinative of whether there was a real danger that VDOC would actually reinstate the challenged conditions. To be sure, the lack of any legal barrier or pre-implementation mechanism might explain why the plaintiffs would like to have injunctive relief, but it had next to no bearing on the likelihood that the corrections officials would indeed reinstitute the prior conditions of confinement in the absence of equitable relief.
Second, while acknowledging that the "defendants [had] individually state[d] [that] they [did] not currently intend to return to the pre-2015 conditions," the district court emphasized that the "most persuasive" reason for an injunction was the prison officials' "consistent refusal to represent to the Court that [VDOC would] not revert to the pre-2015 conditions." Again, however, VDOC's refusal to make such a commitment does not indicate that VDOC was therefore likely to return to the prior conditions. Indeed, Director Clarke stated under oath that he had no intent of doing so, testifying further that he believed that doing so would be "reversing course and going [in] the wrong direction." His testimony and unwillingness to provide a promise was explained to be based only on his unwillingness to bind VDOC and future officials when they might in the future be faced with a serious breach in death row's security. But yet, if such a breach were to occur, VDOC would then undoubtedly have a "legitimate penological justification" for making a change - a circumstance that the majority correctly recognizes would undermine any Eighth Amendment claim. Ante at 362.
Third and finally, the district court relied on the fact that "defendants' change from the pre-2015 conditions of confinement to the current conditions was influenced, although not entirely dependent on, the current litigation." To be sure, the record does indicate that once VDOC officials finally decided to begin implementing the long-discussed changes to death row, they were incentivized to do so on an emergency basis to minimize their legal exposure in this action. But it does not follow that, having done the hard work of instituting the reforms, the corrections officials are likely to undo all their work in the absence of a court order.
In sum, fairly read, the record provides overwhelming evidence that VDOC made changes to the conditions of confinement on death row in the interest of both the inmates and the agency and that VDOC firmly believed that the changes were the right way to go. There is simply no indication of any intent by VDOC officials to return to the previous conditions, which *377 they had resolved to change even before this litigation began. In light of these circumstances, it appears that the only reason for the district court's injunction was some effort to punish VDOC for having previously had in place conditions that the district court believed had violated the Eighth Amendment. And the majority's opinion affirming is thus counterproductive and totally unnecessary. I would reverse the district court's judgment and remand with instructions to dismiss the plaintiffs' action.